# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PATRICIA L. EBERT,            )
                                  )
         Plaintiff,             )
                                  )
      vs.                   )       Case No. 4:10-CV-01171NAB
                                  )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security    )
                                  )
         Defendant.        )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue ("Defendant") denying Patricia Ebert's ("Ebert") application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 434.  Ebert filed a Complaint and Brief in Support of the Complaint.  Doc. 1; Doc. 13. Defendant filed an Answer and a Brief in Support of the Answer.  Doc. 11; Doc. 18.  Ebert did not file a Reply.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge in this matter.  Doc. 21.  Therefore, this judgment is entered pursuant to 28 U.S.C.A. § 636(c)(1).

# I.
# PROCEDURAL HISTORY

Ebert filed an application for benefits on February 27, 2008.[1]  (Tr. 45).  Her claim was denied at the initial determination level and Ebert filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  *Id*.; (Tr. 88).  The ALJ held a hearing and denied the claim in a written decision dated October 28, 2009.  (Tr. 54-74); (Tr. 45-53).  The Appeals Council

---

[1]  Ebert's applications are not included in the administrative record.

denied Ebert's request for review. (Tr. 37-39). As such, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## EVIDENCE BEFORE THE ALJ

### A. Testimony at the Hearing

#### 1. Ebert's Testimony

Ebert testified that she lives with her mother and a friend in the basement of her mother's home. (Tr. 58). She has not worked since December of 2007, but receives long term disability checks every month.[1] *Id.* Ebert had a ruptured aneurysm in January of 2008. *Id.* Doctors "went in and fixed two [aneurysms]." (Tr. 60). Ebert contended that short-term memory loss prevents her from working now. Ebert also stated that she had neck issues and back spasms since the aneurysm. *Id.* She has problems breathing and smokes a pack of cigarettes per day. *Id.* Ebert stated that she knows smoking is not good for chronic obstructive pulmonary disease ("COPD") and that she was "working on quitting.[2]" *Id.* She claimed that short-term memory loss is her biggest problem. *Id.* Ebert's gallbladder was removed in February of 2009. (Tr. 61).

During the day, Ebert watches "a lot of T.V." and does not have any problems "following the T.V. *Id.* Ebert does "some cleaning and cook[ing]." *Id.* She tries not to drive, "but once in a while" she has to drive. *Id.* She goes shopping with somebody. (Tr. 62). Ebert does not have any problems taking care of her personal needs, bathing or dressing. *Id.* She can walk two to three blocks, and can stand for twenty minutes. *Id.* Because of her back spasms, Ebert has difficulty sitting for longer than thirty to forty-five minutes and is limited to lifting fifteen

---

[1] The long term disability checks Claimant receives are not social security disability benefits; the checks come from Hartford Insurance Company.
[2] Ebert's medical records indicate that she has been diagnosed and treated for COPD.

pounds. *Id.* Ebert stated that she suffers from depression and anxiety if she's in a crowd. *Id.* She also stated that riding in a car is scary to her. (Tr. 63).

At the time of the hearing, Ebert was taking the following medications: Celexa, Wellbutrin, Flexeril, Vicodin, and Xanax "on occasion." *Id.* She was not seeing a psychiatrist or any type of counselor. *Id.* Ebert testified that her neck problems began in March of 2007. *Id.* She has back spasms in the middle of her back "several times a day." (Tr. 64). The back spasms are triggered by lifting heavy objects and tiredness. *Id.* The back spasms seem to worsen "into the day." *Id.* She cannot lift fifteen pounds for two-thirds of an eight hour workday. *Id.* She can "maybe" lift five pounds for two-thirds of an eight hour workday. *Id.* She can lift five pounds for one-third of an eight hour workday. (Tr. 65).

Ebert also testified that she has problems with exhaustion and fatigue. *Id.* She sleeps "[a]t a minimum, 12 hours a day." *Id.* She began sleeping this much after the brain aneurysm. *Id.* Since the brain aneurysm, Ebert sometimes has to ask people to repeat themselves during conversations because she forgets what was said. *Id.* Ebert experiences "sadness" and feels like she is "doomed" every day. (Tr. 66). These feelings also began after the brain aneurysm. *Id.* If someone gives her detailed instructions, Ebert stated that she "would probably forget [the instructions], at least parts of [them]." (Tr. 66-67)

The day before the hearing she forgot to take her laundry to her daughter's house. (Tr. 67). Sometimes she forgets to turn off the kitchen sink and it overflows. *Id.* She forgets where she puts things sometimes, "even if [she] put it down, like, for a second . . ." *Id.* She does not have memory loss "all the time." *Id.* The memory loss is "unpredictable" and she never knows

when it is going to happen. *Id.* She has difficulty remembering locations. *Id.* She forgot to go to a memorial service for one of her friends that died. (Tr. 67-68).

## 2. Testimony of Vocational Expert

Vocational Expert, James Israel ("VE"), also testified at the hearing. The VE testified about Ebert's past jobs. He stated her jobs as a bartender and as a medical assistant are semi-skilled, with light exertion. (Tr. 69). Ebert's bus monitor position is "unskilled, light." *Id.* Ebert's job as a gas station cashier is unskilled with a medium exertional level. *Id.* Her data entry job is semi-skilled and sedentary. *Id.* Ebert's job as a shift manager at a fast food restaurant is "semi-skilled and up to medium work." *Id.* Ebert has no "current transferable skills." *Id.*

Responding to a hypothetical scenario posed by the ALJ, the VE testified that an individual of Ebert's age, educational level, with the same past work experience that is required to avoid concentrated exposure to pulmonary irritants, unprotected heights, and hazardous machinery, and is limited to unskilled work with no more than occasional contact with the public, could not perform any of Ebert's past relevant work. *Id.* However, there would be some jobs in the regional and national economy for an individual with the specified limitations, such as an "under production worker, assembler, DOT 734.678-018 . . ." (Tr. 70).

Responding to a second hypothetical posed by the ALJ, the VE testified that there are also unskilled jobs available for an individual with the same criteria as the first hypothetical but that individual is limited to no more than medium exertional level and that could occasionally climb stairs and ramps and never climb ropes, ladders, and scaffolds, frequently balance, stoop, kneel, crouch, and crawl. (Tr. 71).

Responding to a third hypothetical, the VE testified that there are also unskilled jobs available for an individual with the same criteria as first and second hypothetical but that is limited to performing work at a light exertion level. (Tr. 72).

The fourth hypothetical posed by the ALJ was the same as the third hypothetical with the added limitations that the job must allow for occasional unscheduled disruptions of both the workday and the work week secondary to the necessity to lie down for extended periods of time during the day, an inability to focus or concentrate for a full eight hours during the workday, and the necessity to take numerous breaks. (Tr. 73). The VE testified that there are no jobs that could be sustained "with that degree of interruption of work pace and persistence." *Id.*

### B. Medical Records

Ebert complained of "down moods" and some anxiety during a visit to St. Charles Clinic Medical group on October 3, 2007. (Tr. 301). It was noted that Ebert had mild COPD, anxiety, and that she abused tobacco. *Id.* It was also noted that Ebert was a pack-a-day smoker. *Id.* Ebert indicated that she was not ready to quit smoking. *Id.* Ebert was instructed to resume taking Advair for the COPD, and her prescription for Celexa was increased for her anxiety. *Id.*

On January 4, 2008, Ebert visited Saint Joseph Hospital West with reports of nausea, vomiting, neck and back spasms, and a headache. (Tr. 183). A CT scan revealed "diffuse subarachnoid hemorrhage primarily involving the basilar cistern and fourth ventricle." (Tr. 189). "Rupture of an aneurysm or vascular malformation is suspected." *Id.* Ebert was transferred and admitted to St. John's Mercy Medical Center on the same day. (Tr. 206). The reason for admission was noted as "[r]uptured intracranial aneurysm, right intracavernous aneurysm and basilar artery aneurysm." (Tr. 208). It was also noted that Ebert was "[d]eveloping

hydrocephalus." (Tr. 205). A "[v]entriculostomy was placed for mild hydrocephalus by [a doctor]." (Tr. 208). Doctors then performed a cerebral angiogram, "for coiling for both aneurysms." (Tr. 208). After the angiogram, Ebert "was maintained with her ventriculostomy and found to be awake and alert, following commands." *Id.* She was eventually weaned off her ventriculostomy, and it was eventually removed. *Id.* Ebert's headache "gradually subsided, but remained at a low-grade for several days." *Id.* Ebert showed improvement after the procedure; she began physical and occupational therapy. *Id.* Ebert "did well with physical therapy and neuropsychology, and speech therapy." *Id.*

A CT scan on January 12, 2008 showed that Ebert was "stable with no new intracranial hemorrhage." (Tr. 210). It was noted that "[a]t some points [Ebert] is alert and oriented x3, completely appropriate, discussing things such as president election. At other times she is completely confused and agitated." The CT scan on January 12, 2008 indicated the presence of "sinus disease." *Id.* It was also noted that Ebert had chronic obstructive pulmonary disease ("COPD"), which was being treated with Advair. *Id.* Prior to admission to the hospital, Ebert was being treated for bronchitis with prednisone and Zithromax. *Id.* Doctors also noted that Ebert's past medical history included depression, but Ebert denied suicidal thoughts or ideation. (Tr. 211). Ebert was described as having "a 50 pack year plus history of smoking." *Id.* Ebert quit smoking two weeks prior to the hospital stay. *Id.*

A CT scan of Ebert on January 17, 2008 revealed a "[s]mall amount of punctate hemorrhage along the tracks of the previous right frontal ventriculostomy." (Tr. 234). Doctors stated that this "is most likely related to the previous ventriculostomy." *Id.* There was no evidence of fluid collection. *Id.* Ebert was discharged on January 18, 2008 with instructions to follow up with Dr. Thomas R. Forget, M.D. ("Dr. Forget") in two weeks. (Tr. 208).

On January 21, 2008, Ebert visited Dr. Forget to have sutures removed. (Tr. 249). Dr. Forget noted that neurologically, Ebert "look[ed] fine," and directed her to follow up with him in about three weeks. *Id.* A therapy progress note dated January 30, 2008, indicates that Ebert complained of "sudden neck pain" and difficulty with concentration. (Tr. 273). A February 7, 2008 treatment note from St. Charles Clinic Medical Group states that Ebert showed "no neuro deficits." (Tr. 299). The note also indicates that Ebert had quit smoking and that she was "tolerating" her anxiety. *Id.* On February 11, 2008, Dr. Forget noted that Ebert was "doing great." (Tr. 250). He stated that Ebert was still having some headaches and dizziness, "but nothing out of the ordinary for the extent of hemorrhage that she had." *Id.* Ebert was "neurologically intact." *Id.*

On February 19, 2008, a treatment note from SSM Rehab, states that Ebert has a serious level of impairment in working memory. (Tr. 267). The treatment note also indicated that Ebert had no impairment in head/neck flexibility, leg strength/general mobility, visualizing missing information, or visual information processing speed. *Id.* It was also noted on February 19, 2008 that Ebert demonstrated improvement with attention to detail as compared to her initial evaluation, but she was had "serious impairment in memory" with her visual skills. (Tr. 275). A February 28, 2008 SSM Rehab note stated that "[Ebert] is not safe at this time for driving or return to work." (Tr. 269). Ebert was able to type article on computer from a piece of paper. (Tr. 276). On March 11, 2008 Ebert told therapists that she had been feeling depressed. (Tr. 280).

On March 17, 2008, Dr. Forget noted that Ebert "continues to have some problems with mood, mild depression, and frustration with simple memory problems." (Tr. 381). Dr. Forget stated:

These mild cognitive memory problems will likely get better as time goes by but it can take up to 2 years to completely recover from a subarachnoid hemorrhage. I explained this to her and she is happy with this. We're going to get her some muscle relaxers for her neck soreness she has. I think this is probably related to the blood that's still reabsorbing.

*Id.*

On April 10, 2008, Dr. VanGundy noted that Ebert still had "some memory issues left over from SAH injury." (Tr. 285). Ebert also complained of back spasms. *Id.* Ebert appeared "well, alert, oriented x 3, in no distress." *Id.* Ebert was diagnosed with Tobacco Use Disorder and Chronic Airway Obstruction. (Tr. 286).

On May 19, 2008, Ebert underwent a follow-up cerebral angiogram which showed "some persistent filling at the neck of the aneurysm . . . but there [was] no obvious filling within or around the coils." (Tr. 364).

On May 29, 2008, Dr. Forget stated that Ebert "continues to have some mild cognitive dysfunction and significant short-term memory problems." (Tr. 383). Dr. Forget wrote:

I told her that it could take up to 2 years to completely recover from the effects of a ruptured aneurysm and short term memory is often affected severely from this type of hemorrhage. I think we should get some neuropsychology testing to evaluate her memory and cognitive functioning and then repeat the testing in about 3-6 months. However, I don't feel that she's going to be able to return to work for probably at least 6 months.

*Id.* On June 9, 2008, clinical psychologist David A. Lipsitz, Ph.D. ("Dr. Lipsitz"), conducted a psychological consultation of Ebert. (Tr. 309). Ebert was referred to Dr. Lipsitz for the Wechsler Memory Scale – III by the State of Missouri. *Id.* Ebert's chief complaint was short-term memory loss and back spasms. *Id.* Dr. Lipsitz noted that Ebert's general appearance and attitude were "good." *Id.* Ebert "showed no difficulty with posture and gait, no involuntary movements." *Id.* Ebert was cooperative during the session and "offered no direct resistance." *Id.* On the Wechsler Memory Scale-III, Ebert obtained the following index scores: Auditory

Immediate – 83, Visual Immediate – 71, Immediate Memory – 73, Auditory Delayed – 92, Visual Delayed – 68, Auditory Recognition Delayed – 90, General Memory – 79, and Working Memory – 85. (Tr. 310). According to Dr. Lipsitz, Ebert's scores indicate "a wide range of variance from the 'extremely low' to the 'average' range. *Id.* Dr. Lipsitz made the following notation:

> [Ebert] is showing significant decompensation and deterioration in visual memory in both the immediate and delayed realms while her auditory memory appears to be satisfactory. She shows deterioration in immediate memory and also her general memory. These discrepancies are likely due to the brain aneurysm and subsequent organic involvement.

*Id.* Dr. Lipsitiz also stated that Ebert did not appear to be in any acute distress. *Id.* Ebert was oriented as to time, place, and person, and there was "no evidence of any psychotic functioning, no delusions, hallucinations, paranoid ideations, ideas of reference, or feelings of depersonalization." *Id.* There was no evidence of significant depression. *Id.* Dr. Lipsitz noted that Ebert's "thought processes are primarily preoccupied with her brain aneurysm and surgery and her inability to think as she once did." *Id.* Ebert did not appear to be in need of ongoing psychiatric treatment at the time of the evaluation. *Id.* Ebert also appeared to be able to handle her own financial affairs in a satisfactory manner (Tr. 311). Dr. Lipsitz diagnosed Ebert with Adjustment Disorder at Axis I and Occupational Problems at Axis IV. (Tr. 310). At Axis V, Ebert's GAF was 70. *Id.*

Dr. Judith McGee, Ph.D. ("Dr. Mcgee") conducted a Psychiatric Review Technique on June 24, 2008. (Tr. 314-25). Dr. McGee determined that Ebert had the medically determinable impairment of Adjustment Disorder. (Tr. 317). Dr. McGee stated that Ebert's condition imposed a mild restriction on activities of daily living; that Ebert has mild difficulties in maintaining social functioning; that Ebert has mild difficulties in maintaining concentration,

persistence, and pace; and that Clamant has had no episodes of decompensation of extended duration. (Tr. 322). Dr. McGee determined that the evidence did not establish the presence of the "C" criteria. (Tr. 323). She concluded that Ebert's impairment is not severe. (Tr. 324).

On June 30, 2008, Dr. Michael V. Oliveri, Ph.D. ("Dr. Oliveri"), conducted a neuropsychology evaluation on Ebert. (Tr. 385-87). Dr. Oliveri noted that Ebert was "alert and generally attentive." (Tr. 386). Her thought process "was grossly organized and goal directed." Ebert's task management was variable at times. *Id.* Ebert was prone to 'I don't know' responses and provided such responses rapidly. *Id.* Dr. Oliveri described Ebert's effort as "variable." *Id.* Dr. Oliveri's findings are as follows:

> As per reading recognition measure, premorbid verbal skills were estimated to be average. Immediate verbal digital recall placing demands on working memory was broadly average. Immediate and delayed verbal memory for narrative material was average. Verbal learning curve was very poorly progressive (approaching three standard deviations below the mean). Incidental verbal word recall after a period of delay was also impoverished and verbal recognition was inclusive of both false positive and false negative recognition errors. Immediate visual memory for designs was below expectations. Immediate and delayed visuospatial memory of a complex figure was nearly altogether absent (greater than three standard deviations below the mean). Visuospatial recognition was inaccurate. Perceptual-motor speed was average. However, complex visual conceptual tracking was underproductive. As per oral and written symbol substitutions, processing speed was labored. Speech was free from gross dysphasic error. Visual confrontation naming was average. Verbal word fluency was average. Verbal category fluency was average. Writing was functional. Visuospatial judgment was normal. Complex figure reproduction drawing was low normal to marginal. Sustained auditory attention for double simultaneous stimulation was bilaterally accurate. Novel problem-solving was progressive and free from perseverative ideation. Basic abstract reasoning was appropriate.

*Id.* Dr. Oliveri concluded:

> At nearly six months post subarachnoid hemorrhage referable to cerebral aneurysm, she generates a neurocognitive profile that is *markedly atypical* relative to reference groups (patients with known established brain-behavior dysfunction). Such profiles are often seen within the setting of motivational problems and/or long-standing psychiatric/behavioral issues complicating the clinical picture. Of course, such an invalid profile does not preclude her from having residual deficits,

yet the results otherwise did not support that contention. I suspect that her current clinical presentation represents some degree of cognitive symptom over-focus and perhaps symptom magnification within the setting of persisting pain complaints and marked fatigue. Certainly, the pain/fatigue issues could well contribute to cognitive dysfunction.

(Tr. 387). Ebert underwent a cerebral angiogram on December 1, 2008. (Tr. 366). Doctors noted that "what was previously described as filling of aneurysm neck, may actually be tortuosity of right posterior cerebral artery origin." *Id.* A January 17, 2009 cerebral angiogram showed no changes. A June 17, 2009 cerebral angiogram also showed no changes. (Tr. 368).

On August 31, 2009, Walter Clayton Davis, MA, LPC, ("Davis") evaluated Ebert and diagnosed her with major depression and difficulty with "concentration/learning" believed to be due to complications from brain aneurysm. (Tr. 391). Davis opined that Ebert is markedly limited in her ability to remember locations and work-like procedures, her ability to understand, remember and carry out very short and simple instructions, and her ability to understand, remember and carry out detailed instructions. (Tr. 392). Davis also determined that Ebert was markedly limited in her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; her ability to work in coordination with or proximity to others without being distracted by them; her ability to make simple work-related decisions; her ability to complete a normal workday and workweek without interruptions from memory based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Ebert is moderately limited in her ability to sustain an ordinary routine without special supervision. *Id.*

Davis determined that Ebert was mildly limited in her ability to ask simple questions or request assistance; her ability to accept instructions and respond appropriately to criticism from

supervisors; and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 394).  Davis also determined that Ebert was markedly limited in her ability to respond appropriately to changes in the work setting; her ability to be aware of normal hazards and take appropriate precautions; her ability to travel in unfamiliar places or use public transportation; and her ability to set realistic goals or make plans independently of others.  *Id.*  Ebert was said to have no limitations in her ability to interact appropriately with the general public and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 393).

Davis concluded, "[i]t does not appear that Ms. Ebert is functioning at a level to obtain employment at this time due to her inability to concentrate, read/review new materials, remember simple items, and her period of not knowing how to respond to any new stimulus in a task-oriented setting."  (Tr. 391).

### III.
### ALJ DECISION

The ALJ made the following findings: (1) Ebert meets the insured status requirements of the Social Security Act through December 31, 2013; (2) Ebert has not engaged in substantial gainful activity since January 4, 2008, the alleged onset date; (3) Ebert has the "severe" impairments of status post ruptured brain aneurysm, chronic obstructive pulmonary disease, depression, and possible memory deficits; (4) Ebert does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Ebert has the RFC to perform medium work as defined by 20 C.F.R. 404.1567(c), except she can never climb ropes, ladders, or scaffolds. She can occasionally climb ramps and stairs.  She can frequently balance, stoop, kneel, crouch, and crawl.  She must avoid concentrated exposure to pulmonary irritants, industrial hazards and unprotected heights.

Ebert can perform simple tasks only which require no more than occasional contact with the general public and/or coworkers. (Tr. 47-52). (6) Ebert is unable to perform any past relevant work; (7) Ebert is a younger individual under 20 C.F.R. 404.1563; (8) Ebert has at least a high school education and is able to communicate in English; (9) transferability of skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that Ebert is not disabled, regardless of whether Ebert has transferable skills; and (10) there are jobs that exist in significant numbers in the national economy that Ebert can perform. (Tr. 52).

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[3] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson*, 363 F.3d at 737. RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform

---

[3] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.* *See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed

because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989). Additionally, an ALJ's decision must comply "with the relevant legal requirements." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

  (1) the claimant's daily activities;

  (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

  (3) any precipitating or aggravating factors;

  (4) the dosage, effectiveness, and side effects of any medication; and

  (5) the claimant's functional restrictions

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible. *Goff*, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical"); *Rautio*, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the claimant's subjective complaints of pain for legally sufficient reasons. *Baker v. Barnhart*, 457 F.3d 882, 894-95 (8th Cir. 2006); *Carlock v. Sullivan*, 902 F.2d 1341, 1343 (8th Cir. 1990); *Hutsell v. Sullivan*, 892 F.2d 747, 750 (8th Cir. 1989).

## V.
## DISCUSSION

Ebert raises three points of error in arguing that the ALJ's decision is not supported by substantial evidence. First, Ebert claims that the ALJ failed to properly consider the medical

opinion evidence. Second, Ebert contends that the ALJ failed to fully and fairly develop the record. Third, Ebert claims the ALJ failed to properly consider her credibility.

## A.  Opinion Evidence

In her first point of error, Ebert argues that the ALJ did not properly consider the opinions of Claimant's treating and examining physicians. Specifically, Ebert contends that the ALJ did not properly weigh the medical opinions provided by Dr. Forget, Dr. Liptsitz, Dr. Oliveri, and Walter Davis.

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.*

### Dr. Forget's Opinion

Social Security regulations define a treating source as "[the claimant's] physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

Dr. Forget performed the brain aneurysm surgery on Ebert and monitored her condition throughout her stay at the hospital. Dr. Forget continued to treat and monitor Ebert after her release from the hospital. Medical records indicate that Dr. Forget treated or examined Ebert on several occasions between January 21, 2008 and May 29, 2008. Records also indicate that Dr. Forget ordered certain tests on Ebert as a late as June 17, 2009. Because of this ongoing treatment relationship, the court finds that Dr. Forget is a treating source with respect to Ebert's brain aneurysm condition.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R. § 404.1527(e).

"Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000) citing 20 C.F.R § 404.1527(d)(2); *see also* SSR 96-2p.  Here, it is clear that the ALJ considered at least some parts of Dr. Forget's opinion; however, it is equally clear that the ALJ did not give Dr. Forget's opinion controlling weight.  Although it is not error *per se* for an ALJ to refuse to grant controlling weight to a treating physician's opinion, *see Hacker*, 459 F.3d at 937, the Court finds that in this case, the ALJ erred in not giving controlling weight to Dr. Forget's opinion on the issues of the nature and severity of Ebert's memory impairment.  The Court further finds that the ALJ failed to provide any reasons for the particular weight given to Dr. Forget's opinion.

Dr. Forget's opinion related to the nature and severity of Ebert's condition.  Dr. Forget opined on May 29, 2008 that Ebert "continues to have some mild cognitive function and significant short-term memory problems."  Dr. Forget stated that short term memory is often severely affected by the type of brain aneurysm suffered by Ebert.  Dr. Forget twice mentioned in treatment notes that complete recovery from the type of aneurysm suffered by Ebert could take as long as two years.  Dr. Forget also recognized that Ebert's job as a claims specialist "requires a fair degree of cognitive and memory skills" and that Ebert would not be able to return to that type of work "for probably at least 6 months [from May 29, 2008]."  Although this last opinion is arguably not the type of medical opinion to which the ALJ should give controlling weight, *see Ellis*, 392 F.3d at 994, the opinion indicates that Ebert's cognitive and memory problems were expected to persist for at least another six months, which would have been late November of 2008.

As stated above, a treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); see also *Hacker*, 459 F.3d at 937. The Eighth Circuit has also upheld an ALJ's decision to discount or disregard a treating physician's opinion where other medical assessments in the record are supported by better or more thorough medical evidence, *see Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions, *see Cruze v. Chater,* 85 F.3d 1320, 1324-25 (8th Cir. 1996). Here, the ALJ did not find that Dr. Forget rendered inconsistent opinions or that other medical assessments in the record are supported by better or more thorough medical evidence. In addition, Defendant does not allege and the ALJ did not find that Dr. Forget's opinion is not supported by medically acceptable laboratory and diagnostic techniques. *See Hacker*, 459 F.3d at 937. Nor did Defendant allege or the ALJ find that Dr. Forget's opinion is inconsistent with substantial evidence in the record as a whole. *See Id.* Absent such findings by the ALJ, Dr. Forget's opinions should have been given controlling weight. *See* 20 C.F.R. 404.1527(d)(2).

Furthermore, the ALJ fails to provide any reasons for the particular weight he gave to Dr. Forget's opinion. *See Prosch,* 201 F.3d at 1013 (citing 20 C.F.R § 404.1527(d)(2)); SSR 96-2p. The ALJ mentions portions of Dr. Forget's opinion in his decision but fails to specify how much weight he gave to the opinion or why he weighted the opinion as he did. "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch*, 201 F.3d at 1013 citing 20 C.F.R § 404.1527(d). SSR 96-2p provides, in pertinent part:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p. Here, the ALJ provides no reasons for the weight given to Dr. Forget's opinion.

When afforded controlling weight, Dr. Forget's opinion refutes the ALJ's apparent conclusion that the brain aneurysms suffered by Ebert did not cause her to experience cognitive and significant memory problems for any extended period of time. Dr. Forget's opinion establishes that Ebert did experience mild cognitive and significant short-term memory problems after suffering the brain aneurysms, and that these problems are not unusual symptoms for the type of aneurysms Ebert suffered. The opinion also establishes that Ebert's cognitive and memory problems were expected to persist, with limiting effects, until "at least" late November of 2008, which was nearly eleven months after Ebert's alleged onset date. By use of the phrase "at least," Dr. Forget acknowledged the possibility that Ebert's cognitive and memory problems could continue beyond late November of 2008. The possibility that Ebert's symptoms could last beyond late November is made more apparent when considering Dr. Forget's statement that Ebert's complete recovery could potentially take as long as two years.

In not granting controlling weight to Dr. Forget's opinions, the ALJ overlooked critical evidence relating to the nature and severity of Ebert's condition. Particularly, the ALJ ignored evidence that establishes that Ebert did experience the significant memory problems which she alleged as the basis of disability. The evidence also establishes that Ebert experienced the memory problems well beyond the period of her hospitalization, and that the memory problems were expected to persist for at least six months after her last visit with Dr. Forget. Because the ALJ failed to acknowledge that Ebert suffered memory problems attributable to the aneurysms

for an extended amount of time, the ALJ did not address the severity and duration of those problems. Therefore, on remand, the ALJ must evaluate the severity and duration of Ebert's memory problems and determine whether Ebert is entitled to disability benefits for any period of time.

**Dr. Lipsitz's Opinion**

Dr. Lipsitz did not have an ongoing treatment relationship with Ebert; he examined her on one occasion. Dr. Lipsitz's opinion is therefore considered as a non-treating source opinion. 20 C.F.R. § 404.1502. As a non-treating source opinion, Dr. Lipsitz's opinion is not entitled to controlling weight under any circumstances. *See* 20 C.F.R. 404.1527. However, regardless of its source, the ALJ is to evaluate every medical opinion received. 20 C.F.R. 404.1527(d). The ALJ is to consider all of the following factors in deciding the weight to give any medical opinion that is not given controlling weight as a treating source opinion: (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) any other factors the claimant or others brings to the ALJ's attention. 20 C.F.R. § 404.1527(d); *see also Wagner*, 499 F.3d at 848-49.

Here, the ALJ neither acknowledged nor applied the factors set forth in 20 C.F.R. 404.1527(d) to Dr. Lipsitz's opinion. Therefore it is not clear to the Court how the ALJ weighed Dr. Lipsitz's opinion or why he weighed it in the manner he did. It is apparent that the ALJ did at least consider Dr. Lipsitz's opinion because he set out some of Dr. Lipsitz's findings within the decision. The Court takes issue with one of the findings which may have influenced the weight the ALJ gave to Dr. Lipsitz's opinion.

The ALJ stated that Ebert's memory "appeared adequate" during her evaluation by Dr. Lipsitz. (Tr. 51). This finding has no support in the record. Nowhere in Dr. Lipsitz's opinion or

records does he state or imply that Ebert's overall memory appeared adequate. In fact, Dr. Lipsitz's opinion is very clear on the point that some aspects of Ebert's memory were not adequate. Dr. Lipsitz indicated that memory testing showed "a wide range of variance [in Ebert's memory] from 'extremely low' to the 'average' range." (Tr. 310). Dr. Lipsitz noted that Ebert showed "significant decompensation and deterioration in visual memory in both the immediate and delayed realms . . ." *Id.* He also noted that Ebert's auditory memory appeared "satisfactory," but that Ebert showed "deterioration in immediate memory and also in her general memory." *Id.*

The ALJ's finding that Ebert's memory "appeared adequate" to Dr. Lipsitz is not supported by substantial evidence. Therefore, any weight that the ALJ gave to that finding was erroneous. On remand, the ALJ shall re-evaluate Dr. Lipsitz's opinion regarding Ebert's memory problems. The Court does not suggest the weight that the ALJ should give to Dr. Lipsitz's opinion on remand. However, the Court does note that Dr. Lipsitz's opinion is consistent with the opinion of Ebert's treating physician, Dr. Forget, to the extent that both opinions acknowledge that Ebert did experience memory problems attributable to the brain aneurysms and that these problems existed for a period of time that extended well beyond Ebert's hospitalization.

As stated above, because the ALJ refused to acknowledge that Ebert experienced memory problems for an extended period of time, he did not evaluate the severity or duration of the memory problems. Dr. Lipsitz's opinion provides relevant evidence about the severity of Ebert's memory problems and the ALJ should evaluate the opinion as set forth in 20 C.F.R. § 404.1527(d) to determine the appropriate weight to give the opinion.

**Dr. Oliveri's Opinion**

Dr. Oliveri evaluated Ebert on only one occasion. Therefore, Dr. Oliveri's opinion, like Dr. Lipsitz's opinion, is considered as a non-treating source opinion. 20 C.F.R. § 404.1502. As a non-treating source opinion, Dr. Oliveri's opinion is not entitled to controlling weight and should be evaluated as set forth in 20 C.F.R. 404.1527(d). 20 C.F.R. § 404.1527(d); *see also Wagner*, 499 F.3d at 848-49.

It is apparent to the Court that the ALJ relied on Dr. Oliveri's opinion to a greater extent than he did on other medical opinions. For instance, the ALJ repeatedly noted Dr. Oliveri's negative findings, particularly the finding that Ebert's testing was invalid because her neurocognitive profile was "markedly atypical" possibly because of "some degree of cognitive symptom over-focus and perhaps symptom magnification within the setting of persisting pain complaints and marked fatigue." (Tr. 387). However, the ALJ provides no reasons why Dr. Oliveri's opinion was credited over the other medical opinions in the record.

Dr. Oliveri examined Ebert one month after Dr. Forget, Ebert's treating physician, noted that Ebert "continues to have some mild cognitive dysfunction and significant short-term memory problems," and only three weeks after Dr. Lipsitz noted that Ebert showed "significant decompensation and deterioration in visual memory in both the immediate and delayed realms . . . [and] deterioration in immediate memory and also in her general memory." Neither Dr. Forget nor Dr. Lipsitz noted any suspicions that Ebert was exaggerating her symptoms. Dr. Oliveri was the first and only doctor to raise any concerns about the legitimacy of Ebert's memory complaints and it appears to the Court that the ALJ accepted Dr. Oliveri's opinion as conclusive on this issue, despite the fact that other doctors found that Ebert did suffer memory problems as a

result of the aneurysms, and despite the fact that Dr. Oliveri also stated that "[o]f course, [Ebert's] invalid profile does not preclude her from having residual deficits . . ." *Id.*

"As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole . . ." *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir. 2000). Finding no other evidence in the record to support Dr. Oliveri's conclusion that Ebert was exaggerating her symptoms, the Court cannot say that substantial evidence supports the ALJ's reliance on Dr. Oliveri's opinion on this issue. This is not to say that Dr. Oliveri's opinion is not entitled to any weight. However, it was error for the ALJ to rely on Dr. Oliveri's opinion that Ebert was exaggerating her symptoms where other doctors, including a treating physician, had recently concluded that Ebert did experience memory problems.

As stated above, the ALJ did not evaluate or address the severity or duration of Ebert's memory problems. The Court has determined that Dr. Forget's opinion should have been given controlling weight on the issue of whether Ebert experienced the memory problems she alleged. Therefore, on remand, the ALJ shall examine the severity and duration of Ebert's memory problems. The ALJ should evaluate Dr. Oliveri's opinion as set forth in 20 C.F.R. § 404.1527(d) to determine the appropriate weight to give to his opinion. The ALJ shall bear in mind that, standing alone, Dr. Oliveri's opinion does not constitute substantial evidence in the record as a whole. *See Cantrell,* 231 F.3d at 1107. Therefore, any finding in Dr. Oliveri's opinion that the ALJ relies on must be supported by other evidence in the record. *See Id.*

**Walter Davis' Opinion**

Davis, as Dr. Lipsitz and Dr. Oliveri, evaluated Ebert on only one occasion. Therefore, Davis' opinion is considered as a non-treating source opinion. 20 C.F.R. § 404.1502. As a non-

treating source opinion, Davis' opinion is not entitled to any particular weight and should be evaluated as set forth in 20 C.F.R. 404.1527(d). 20 C.F.R. § 404.1527(d); *see also Wagner*, 499 F.3d at 848-49.

Unlike Dr. Lipsitz's and Dr. Oliveri's opinions, the ALJ does explain why he provided little or no weight to Davis' opinion. The ALJ described the restrictions noted by Davis as "extreme limitations," and disregarded Davis' opinion because he felt that Davis "merely acted as [Ebert's] scrivener and parroted everything [Ebert] said." In discrediting Davis' opinion, the ALJ noted that Davis did not have a treatment relationship with Ebert and that Davis' opinion had no support from "longitudinal records."

Davis' opinion does appear to be completely based on his observations and statements made by Ebert during Davis' only examination of Ebert. Davis' opinion does not reference any of Ebert's "longitudinal" medical records and does not otherwise indicate that he considered Ebert's past medical history, other than what Ebert told him during the examination. Neither does Davis' opinion include any evidence that he performed any type of testing or diagnostic evaluations other than interviewing Ebert. *See* 20 C.F.R. § 404.1527(d)(3) (The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight that opinion will be given.). The only medical signs Davis relies on in his opinion are psychiatric signs. *See* 20 CFR §404.1528(b). However, any medical signs relied on by a medical source "must be shown by medically acceptable clinical diagnostic techniques." *See Id.* Davis did not identify any clinical diagnostic techniques he used in evaluating Ebert.

Davis' opinion also fails to include an explanation of his findings and why his findings support the limitations he noted. The better the explanation a source provides for an opinion, the

more weight that opinion will be given. 20 C.F.R. § 404.1527(d)(3). Although some of Davis' findings concerning Ebert's memory and some of the noted limitations are generally consistent with findings of other doctors, Davis provides no basis for his opinion. Therefore, the ALJ's decision to disregard Davis' opinion is supported by substantial evidence.

Ebert also seems to argue in her first point of error that the ALJ erred in finding that her depression was not disabling. To this point the Court notes that although Ebert's medical records indicate that she informed multiple doctors that she had a history of depression, the record does not contain any medical records that establish that Ebert has such a history. Nevertheless, the ALJ listed depression as one of Ebert's severe impairments. However, the record contains only minimal evidence to support Ebert's contention that her depression is disabling. Dr. Forget noted on only one occasion that Ebert had some problems with mild depression. (Tr. 381). However, the record does not indicate that Dr. Forget treated Ebert for mild depression or that he recommended that she seek treatment for the condition. Also, Dr. Lipsitz, a clinical psychologist, found no evidence of significant depression and noted that Ebert did not appear to be in need of ongoing psychiatric treatment. (Tr. 310). Although Davis diagnosed Ebert with major depression, the ALJ, as discussed above, properly discredited Davis' opinion. Furthermore, the record does not indicate that Ebert sought treatment from any medical professional specifically for depression. *See Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995)) ("'While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem'"). Therefore, the Court finds substantial evidence to support the ALJ's finding that Ebert's depression is not disabling.

## B. Developing the Record

Ebert argues that the ALJ failed to fully and fairly develop the record regarding Dr. Forget's opinion. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) citing *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004). "Although that duty may include re-contacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped." *Id.* Furthermore, "reversal due to failure to develop the record is only warranted where such failure is unfair and prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995).

Here, Ebert claims the ALJ had a duty to direct a precise inquiry to Dr. Forget to clarify his opinion. Ebert however fails to state what part of Dr. Forget's opinion she believes to be unclear. The Court analyzed Dr. Forget's opinion above, and did not find his opinion to be unclear on any point. Although Dr. Forget's opinion does not provide a definite time or date for full recovery for Ebert's memory problems, the Court is not convinced that re-contacting Dr. Forget can resolve this issue, particularly since the record indicates that Dr. Forget did not examine Ebert after May 29, 2008, which is when Dr. Forget opined that Ebert's cognitive and memory problems were expected to persist with some limiting effects for at least another six months.

As discussed above, the ALJ, on remand, is to assess the severity and duration of Ebert's memory problems. If the ALJ finds a need to re-contact Dr. Forget for clarification of his opinion on those issues, he should. However, the Court does not find that the record is insufficiently developed because the ALJ did not re-contact Dr. Forget.

## C. Ebert's Credibility

Ebert argues that the ALJ failed to properly consider her credibility.  The Court agrees.  In his discussion of Ebert's credibility, the ALJ set forth eight examples of what he alleged to be "inconsistencies" in the record.  Based on these alleged "inconsistencies," the ALJ concluded that Ebert's credibility is "questionable."  The Court finds that substantial evidence does not support this determination.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints.  *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  *Rautio*, 862 F.2d at 179; *Millbrook*, 780 F.2d at 1374.  Where adequately explained and supported, credibility findings are for the ALJ to make."  *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

In assessing a claimant's credibility, the ALJ has to consider all of the evidence in the record and the *Polaski* factors (prior work record, and observations by third parties and doctors relating to such matters as (1) claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the dosage, effectiveness, and side effects of medication, and (5) functional restrictions). *See Lowe*, 226 F.3d at 972 (citing *Polaski,* 739 F.2d at 1322).  "The ALJ [is] not required to methodically discuss each *Polaski* factor, so long as he acknowledge[s] and examine[s] those considerations before discounting the claimant's subjective complaints."

Here, the ALJ fails to adequately explain or provide any support for the alleged "inconsistencies" he sets forth in his decision.  The ALJ simply lists what he claims to be "inconsistencies" and provides no explanation for why any of the alleged "inconsistencies" make

Ebert's credibility questionable.  Furthermore, the ALJ failed to acknowledge or consider the *Polaski* factors in assessing Ebert's credibility.  For these reasons, the Court finds that the ALJ's credibility determination is not supported by substantial evidence.  On remand, the ALJ is to re-evaluate Ebert's credibility and consider all of the evidence in the record, including the *Polaski* factors.  *See Lowe*, 226 F.3d at 972 (citing *Polaski,* 739 F.2d at 1322).  The ALJ shall provide an adequate explanation for his decision and his decision must be supported by substantial evidence. *Rautio*, 862 F.2d at 179; *Millbrook*, 780 F.2d at 1374.

## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole does not support the Commissioner's decision that Ebert is not disabled.

The Court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.  Upon remand, the ALJ is directed to re-examine the record in a manner consistent with this Court's opinion.  By reversing and remanding this matter, the Court does not imply that the Commissioner should return a finding of "disabled."  The Court is only of the opinion that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Complaint is **GRANTED** in part, and **DENIED**, in part. [Docs. 1, 13]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

Dated this <u>18th</u> day of July, 2011.

<span style="margin-left:40%">_____/s/ Nannette A. Baker_____<br>NANNETTE A. BAKER<br>UNITED STATES MAGISTRATE JUDGE</span>